**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NARRAGANSETT INDIAN TRIBE,     :
acting by and through the Narragansett    :
Indian Tribal Historic Preservation Office,    :
                               :     Civil Action No.:    22-2299 (RC)
    Plaintiff,            :
                               :     Re Document Nos.:    18, 31, 33
                               :
    v.                      :
                               :
STEPHANIE POLLACK,         :
Acting Administrator, Federal Highway    :
Administration, *et al.*,          :
                               :
    Defendants.          :

<u>**MEMORANDUM OPINION**</u>

**GRANTING STATE DEFENDANTS' MOTION TO DISMISS; GRANTING IN PART AND DENYING IN
PART THE AGENCY'S MOTION TO DISMISS; DENYING PLAINTIFF'S MOTION TO COMPEL
SUPPLEMENT TO ADMINISTRATIVE RECORD**

## I. INTRODUCTION

The Narragansett Indian Tribe, acting by and through the Narragansett Indian Tribal

Historic Preservation Office ("Narragansett" or the "Tribe"), brings this action against Stephanie

Pollack, in her capacity as Acting Administrator of the Federal Highway Administration

("FHWA" or the "Agency"), and several Rhode Island defendants—the state itself, its

Department of Transportation, and Claire Richards, the Executive Counsel of the Rhode Island

Office of the Governor, in her individual capacity (collectively, "State Defendants")—

challenging actions they allegedly took in connection with a highway project in Rhode Island.

The National Historic Preservation Act ("NHPA"), codified at 54 U.S.C. §§ 300101 *et seq.*,

requires that federal agencies "take into account" the preservation of historic sites when

implementing federal projects.  This case represents the Tribe's renewed attempt to press claims

asserted in a previous action that "involve[d] the same parties and claims," which this Court dismissed on March 15, 2022.  Compl. at 1, *see generally Narragansett Indian Tribe v. Pollack, et al.*, No. 20-cv-0576, 2022 WL 782410 (D.D.C. Mar. 15, 2022).  The Tribe argues that Defendants acted unlawfully when they terminated and reformulated programmatic agreements pursuant to the NHPA and related federal regulations.  *See* Compl. at 2–3, ECF No. 1.

State Defendants and the Agency separately move to dismiss.  *See* State Defs.' Mot. Dismiss ("State's Mot."), ECF No. 18; Agency's Mot. Dismiss ("Agency's Mot."), ECF No. 31. The Tribe opposes the motions, *see* Pl.'s Opp'n to State's Mot., ECF No. 20; Pl.'s Opp'n to Agency's Mot., ECF No. 32, and also moves for an order to supplement the administrative record, *see* Pl.'s Mot. Suppl. Admin. Rec., ECF No. 33.  For the reasons set forth the below, the Court grants State Defendants' motion to dismiss, grants in part and denies in part the Agency's motion to dismiss, and denies the Tribe's motion to supplement the administrative record.

## II.  BACKGROUND[1]

### A.  Statutory and Regulatory Framework

The NHPA requires that any federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . prior to the approval of the expenditure of any Federal funds on the undertaking . . . shall take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108.  This requirement is often referred to as the "Section 106" process.  The Advisory Council on Historic Preservation ("ACHP") is the agency responsible for issuing regulations that implement the Section 106 process.  36 C.F.R. § 800.2(b).  Regulations codified at 36 C.F.R. § 800 *et seq.* lay out the steps an agency must take

---

[1] This section draws in significant part from the Court's explanation in *Narragansett*, 2022 WL 782410, at *1–4.

to comply with NHPA's requirement to "take into account the effect of the undertaking on any historic property."  "The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning."  36 C.F.R. § 800.1(a).  Subpart B of this chapter of the Code of Federal Regulations lays out in detail the normal Section 106 process. *See* 36 C.F.R. §§ 800.3–800.13.  Subpart C discusses program alternatives. *See id.* §§ 800.14–800.16.

One program alternative to the Section 106 process is to develop a programmatic agreement.  *See* 36 C.F.R. § 800.14(b).  Programmatic agreements "govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings."  *Id.*  Before implementing a programmatic agreement, the federal agency must consult with the appropriate stakeholders, including state historical preservation offices and Indian tribes.  *Id.* §§ 800.14(b)(2)(i), (f).  Programmatic agreements take effect when executed by the stakeholders.  *Id.* § 800.14(b)(2)(iii).  "Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings . . . covered by the agreement."  *Id.*  The regulations state that if ACHP "determines that the terms of a programmatic agreement are not being carried out, or if such an agreement is terminated, the agency official shall comply with subpart B of this part" with respect to the undertaking covered by the agreement.  *Id.* § 800.14(b)(2)(v).  An approved programmatic agreement satisfies an agency's Section 106 responsibilities "until it expires or is terminated by the agency . . . or [ACHP]."  *Id.* § 800.14(b)(2)(iii).

Because federal regulations state that compliance with programmatic agreements fulfills an agency's Section 106 responsibilities, courts analyze programmatic agreements to determine whether agency action is compliant with their terms.  *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 847 (10th Cir. 2019) (stating that the issue to resolve is whether agency violated requirements of a programmatic agreement); *Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV-1402504 JAK (SPx), 2015 WL 12661945, at *13 (C.D. Cal. June 11, 2015) (explaining that obligations under a programmatic agreement serve as a substitute to compliance with Section 106).  Holding an agency to the terms of a programmatic agreement follows from the regulatory language; if "[c]ompliance with the procedures established by an approved programmatic agreement" can satisfy an agency's Section 106 obligations, 36 C.F.R. § 800.14(b)(2)(iii), noncompliance with the terms would not satisfy those obligations.

More generally, Section 106 does not dictate substantive results.  Instead, Section 106 is a procedural statute requiring a federal agency to take certain steps prior to beginning a project.  *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003) ("An essentially procedural statute, section 106 imposes no substantive standards on agencies, but it does require them to solicit [ACHP's] comments and to take into account the effect of [their] undertakings." (internal quotations and citations omitted)).

### B.  Factual and Procedural History

The Tribe originally filed a version of this action in the U.S. District Court for the District of Rhode Island before moving to transfer to this Court.  *Narragansett*, 2022 WL 782410, at *1 n.1.  According to the present Complaint, which includes a section titled "General Allegations" that is substantially identical to that included in the pleadings in the prior action, FHWA has provided substantial funding for the replacement of the I-95 Providence Viaduct Bridge.  Compl

4

¶ 31.  In the initial planning phases of the project, FHWA determined that the bridge replacement "would result in adverse effects on the Providence Covelands Archaeological District."  *Id.* ¶ 34. To address the adverse effects, FHWA developed a programmatic agreement (the "first PA") in consultation with Narragansett, the Rhode Island State Historic Preservation Office, and the Rhode Island Department of Transportation ("RIDOT").  *Id.* ¶ 36.

The first PA required "FHWA in coordination with RIDOT" to acquire and transfer ownership of three parcels of land to the Tribe.  *Id.* ¶ 40.  The parcels were the Salt Pond Archaeological Preserve, the so-called "Providence Boys Club – Camp Davis" property, and the so-called "Chief Sachem Night Hawk" property.  *Id.*  The three parcels of land "have inherently historic, cultural, and religious significance to the Tribe."  *Id.* ¶ 45.  The transfer of ownership was meant to mitigate the negative effects of the highway project.  *See id.* ¶¶ 34–40.

Construction began on the highway project in June 2013, but ownership of the properties had not yet been transferred to the Tribe.  *See id.* ¶¶ 48–49.  At this point, the parties to the programmatic agreement reached an impasse.  RIDOT refused to transfer title of the Providence Boys Club – Camp Davis and Chief Sachem Night Hawk properties to the Tribe unless the Tribe specifically waived sovereign immunity with respect to those properties.  *See id.* ¶ 49.  But the programmatic agreement contained no provision requiring the waiver of sovereign immunity. *See id.* ¶ 47.  The Tribe thus refused to agree to the condition and RIDOT refused to transfer the properties absent a waiver.  *See id.* ¶¶ 49–54.  Confronted with this impasse, FHWA sought to terminate the programmatic agreement even though construction on the southbound lane had already been completed and opened to traffic.  *See id.* ¶¶ 53, 56.

ACHP issued comments on the proposed termination of the programmatic agreement on May 3, 2017.  *See id.* ¶ 57.  ACHP stated that the project should not be delayed, that the Salt

Pond Archaeological Preserve should be preserved under the terms of the original programmatic agreement, and that the other two parcels should be transferred to the Tribe without a waiver of sovereign immunity. *See id.* ¶ 59. After receiving and considering ACHP's comments, FHWA determined that it would reinitiate the normal Section 106 consultation process and draft a new programmatic agreement. *See id.* ¶ 60. FHWA outlined new mitigation items to address the adverse effects of the project, including that, in lieu of the land transfers of the Providence Boys Club – Camp Davis and Chief Sachem Night Hawk properties, the programmatic agreement would implement an academic-level historic context document about the Tribe, Section 106 training for the Tribe, a video documentary about the Tribe, and a teaching curriculum for Rhode Island public schools about the Tribe. *See id.* ¶ 61. This second programmatic agreement (the "second PA") was executed on September 18, 2019. *See id.* ¶ 62. Narragansett alleges that the second PA was negotiated without consulting the Tribe and has "resulted in a complete failure to address and mitigate the adverse effects of the Viaduct Project, including the destruction of the site that has resulted from completion of the southbound lane of the Viaduct Project." *Id.* ¶¶ 62, 65.

### C.  Prior Decision

A brief review of the Court's opinion dismissing the previous action provides relevant context for its consideration of the present motions.[2]  In that action, after the Tribe added State Defendants in an amended complaint, State Defendants moved to dismiss for lack of personal jurisdiction, improper venue, improper process and service of process, lack of subject-matter

---

[2] As both parties move to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1), the Court may "consider such materials outside the pleadings as it deems appropriate to resolve the [jurisdiction] question[.]"  *Machie v. Chandonnet*, 140 F. Supp. 3d 4, 9 (D.D.C. 2015) (quoting *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), *aff'd*, No. 00-7176, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001)).

jurisdiction, and failure to state a claim. *See Narragansett*, 2022 WL 782410, at *3. The Court granted the motion to dismiss without prejudice on the ground that it lacked personal jurisdiction over State Defendants, and therefore did not reach the other asserted grounds for dismissal. *Id.* at *5-6. The Court found that the Tribe had "not met its burden to demonstrate that this Court has personal jurisdiction over the State Defendants" based on its "lack of citation to any facts or authority," *id.* at 6, but it also observed that "State Defendants' contacts with the District seem to consist of negotiations with the federal government over the programmatic agreement and Section 106 process," *id.* at *6 n.5. While the Tribe did not allege enough to permit a conclusive determination, the Court expressed skepticism that these contacts could suffice to create personal jurisdiction over State Defendants because "these negotiations may fall under the 'government contacts' exception to the District's long-arm statute." *Id.* (citing *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 25 (D.D.C. 2014)).

The Agency also moved to dismiss for lack of subject jurisdiction, arguing that the Tribe lacked standing because "the State Defendants caused the alleged injuries by insisting on the sovereign immunity waiver and failing to transfer the properties, and that the injuries would therefore be redressable only through the State Defendants." *Id.* at *6. Because the Tribe "barely addresse[d] standing in its opposition," and "[g]iven the State Defendants' role in the relevant conduct and Narragansett's failure to squarely address the Agency's arguments," as well as "the case law's guidance about the difficulty of showing standing when a third party is involved," the Court found that the Tribe had not "sufficiently demonstrated standing" and granted the Agency's motion to dismiss without prejudice. *Id.* at *7-8.

### III.  LEGAL STANDARDS

### A.  Personal Jurisdiction

The plaintiff bears the burden of establishing that a court has personal jurisdiction over each defendant.  *See Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021).  "Personal jurisdiction may be satisfied by either specific or general jurisdiction."  *Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 54 (D.D.C. 2017) (citing *D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008)).  While factual discrepancies in the record must be resolved in favor of the plaintiff, *see Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017), a court is not required to accept as true a plaintiff's "conclusory statements" or "bare allegations" regarding the defendants' actions when conducting the personal jurisdiction analysis, *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000).  The court may "receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (citation omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Erwin-Simpson*, 985 F.3d at 888 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  There are two types of personal jurisdiction: general and specific.  *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020).  General jurisdiction "sets a high bar," requiring a defendant to have "continuous and systematic" contacts with the forum state, but then permitting the forum to adjudicate any claims brought against the defendant.  *D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008).  Specific jurisdiction requires that the suit "arise out of or relate to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (cleaned up).  "This

requires determining both that (i) jurisdiction is permissible under the forum state's long-arm statute, and (ii) the exercise of personal jurisdiction comports with the Due Process Clause." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020). The District of Columbia's long-arm statute provides, in relevant part, that personal jurisdiction may be exercised "over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1).

## B. Standing

Courts address subject-matter jurisdiction as a "threshold matter, " *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998), and "[t]he burden of establishing any jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff." *CFA Inst. v. Andre*, 74 F. Supp. 3d 462, 465 (D.D.C. 2014); *see also McBride v. Mnuchin*, No. 19-cv-60, 2019 WL 3323412, at *2 (D.D.C. July 24, 2019) ("Before addressing the merits of a case, a court must confirm that it has subject matter jurisdiction.") (internal citation omitted). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and therefore is "a necessary 'predicate to any exercise of [Article III courts'] jurisdiction.'" *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.D.C. 2012) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). Accordingly, "[e]very plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." *Id.* at 1362 (internal citation omitted). Standing is "not dispensed in gross;" rather, Plaintiffs must show standing as to each claim. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation omitted).

When assessing standing at the motion to dismiss stage, the Court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but will "not assume the truth of legal conclusions, nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks and citations omitted). "[B]ecause subject-matter jurisdiction relates to the Court's power to hear the claim, the Court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion." *Am. Fed'n Gov't Emps. v. Sec'y of the Air Force*, 841 F. Supp. 2d 233, 235–36 (D.D.C. 2012). "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## IV.  ANALYSIS

### A.  State Defendants' Motion to Dismiss

The Complaint names the "State of Rhode Island and agencies including The Rhode Island Department of Transportation, and Claire Richards, individually," as State Defendants. Compl. at 1.  Claire Richards is Executive Counsel for the Governor of Rhode Island.  *See id.*; Richards Aff. at 2, ECF No. 18-3.  State Defendants move to dismiss for lack of personal jurisdiction, for improper venue, for improper service of process, and for failure to state a claim. *See generally* State's Mot.  Because the Court finds that it lacks personal jurisdiction over State Defendants, it does not reach the other asserted grounds for dismissal.

1. General Jurisdiction

As an initial matter, State Defendants argue that it is "beyond peradventure that there is no general personal jurisdiction over the State Defendants." State's Mot. at 11. State Defendants point to the facts that they do not "reside in the District of Columbia and there is no basis for concluding that the District of Columbia is 'home' for any office, department, or employee of the State of Rhode Island." *Id.* (citing Richards Aff.). The Tribe does not contest this point. Pl.'s Opp'n to State's Mot. at 4 ("Plaintiff's argument is simply that while state entities are generally not subject to personal jurisdiction, the actions of an individual employee, attorney Richards can be subject to personal jurisdiction based on minimum contacts . . . ."). Accordingly, the Court finds that there is no general personal jurisdiction over State Defendants.

2. Specific Jurisdiction as to Rhode Island and RIDOT

Turning to specific jurisdiction, State Defendants first point out that "Plaintiff does not make any assertions at all concerning any contacts between the State of Rhode Island, its agencies or RIDOT." Pl.'s Opp'n to State's Mot. at 13. And the Tribe concedes that its argument for personal jurisdiction relies entirely on allegations concerning "the actions of an individual employee, attorney Richards." Pl.'s Opp'n to State's Mot. at 4; *see also id.* at 8 ("Plaintiff's Complaint asserts specific personal jurisdiction over attorney Claire Richards in the District of Columbia . . . ."). The Court therefore has no basis on which to exercise personal jurisdiction over the State of Rhode Island or RIDOT.[3]

---

[3] RIDOT is the only state agency named as a defendant in the complaint, but to the extent the language of the Complaint implicates any other Rhode Island agency the same holding obtains.

3.  Specific Jurisdiction as to Claire Richards

With respect to Ms. Richards, State Defendants argue (1) that the Complaint does not allege "connections with the District of Columbia sufficient to meet any of the enumerated provisions in the District of Columbia's long-arm statute;" (2) that "there are no minimum contacts that would satisfy due process," and (3) that, regardless, the "activities alleged in the Complaint are precisely the type of activity protected by the government contacts exemption and cannot serve as the basis for personal jurisdiction."  State's Mot. at 12–13, 16.

Taking the latter first, the Court agrees that the government contacts exception to the District of Columbia's long-arm statute is operative here.  "[W]hile contract negotiations ordinarily constitute business transactions upon which personal jurisdiction may be based for the purpose of D.C.'s long-arm statute, there is a settled 'government contacts' exception to this general rule."  *Alkanani*, 976 F. Supp. at 25.  Under this exception, "a nonresident's entry into the District of Columbia for 'the purpose of contacting federal government agencies cannot serve as a basis for personal jurisdiction.'"  *Id.* (quoting *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55, 62 (D.D.C. 2006); *see also United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995) ("[C]ontact with a federal instrumentality located in the District will not give rise to personal jurisdiction."). The government contacts exception "finds its source in the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry."  *Env't Rsch. Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976); *id.* ("To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in

government, but also would threaten to convert the District of Columbia into a national judicial forum.").

By the Tribe's own description, and consistent with the Court's suspicion in its opinion dismissing the prior action, *see Narragansett*, 2022 WL 782410, at *6 n.5, Ms. Richards's alleged contacts with D.C. are comprised entirely of her work on the programmatic agreements. *See* Pl.'s Opp'n to State's Mot. at 4 ("[T]he actions of an individual employee, attorney Richards can be subject to personal jurisdiction based on minimum contacts with the [Agency] as a fiduciary and her collusion with the [Agency] to violate [the ACHP regulations]."); *id.* at 14–15 (explaining that the basis for personal jurisdiction consists of "communications and the specific actions of attorney Claire Richards [that were] part of the decision-making process of the FHWA"); *id.* at 15 ("Her activities . . . represented the State and their interests in the transferring or not transferring properties to the federal Government, as part of the mitigation measure required to [*sic*] Section 106 process. . . .  On behalf of the State, she was transacting business.").

Nonetheless, the Tribe presents two arguments as to why the government contacts exception should not apply.  First, the Tribe argues that Ms. Richards's "business with the [Agency] was to assert the state's legal position with regards to the compliance with the NHPA, not to obtain a contract or grant for Highway program funding."  Pl.'s Opp'n to State's Mot. at 15.  That Ms. Richards was merely making assertions and not negotiating to receive anything is dubious and contradicted elsewhere in the Tribe's submission and the Complaint.  *See id.* at 17 ("Her goal was to receive a decision from the FWHA that maintained state control over all the mitigation measures of the Section 106 process under the NHPA."); Compl. ¶ 17 ("Claire Richards . . . was in contact with the FHW, including agency personnel in Washington D.C.  The communication involved negotiations about the first and second PA with the Tribe, FHWA, and

the State of Rhode Island.").  Regardless, the distinction is irrelevant, as the government contacts

exception applies well beyond the boundaries of contract or grant negotiation, *see, e.g.*, *App*

*Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 327 (D.D.C. 2015) (applying exception to

copyright registration); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 44 (D.D.C. 2003)

(applying exception to lobbying activity); *Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*, 989 F.

Supp. 265, 271 (D.D.C. 1998) (applying exception to filing suit against an agency after denial of

an application to approve products); *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp.

46, 50 (D.D.C. 1994) (applying exception to making filings with federal agencies), in keeping

with its broad goal to "safeguard free public participation in government."  *Sickle v. Torres*

*Advanced Enter. Sols., LLC*, No. 11-2224, 2020 WL 5530357, at *9 (D.D.C. Sept. 14, 2020)

(citation omitted).

Second, the Tribe points to the decision of a panel of the D.C. Court of Appeals in *Rose*

*v. Silver*, 394 A.2d 1368 (D.C. 1978), which explained that "the First Amendment provides the

only principled basis" for applying the government contacts exception.  *Id.* at 1374.

Accordingly, the Tribe appears to argue that, because Ms. Richards's "contacts with the FHWA

attorney do not raise first amendment concerns," the exception does not apply here.  Pl.'s Opp'n

to State's Mot. at 18.  However, the D.C. Circuit has cautioned against applying the *Rose* panel's

observation as a limitation on the *en banc* D.C. Court of Appeals' "holding against governmental

contacts as a basis for personal jurisdiction in *Environmental Research*."  *Naartex Consulting*

*Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983); *see also Shaheen v. Smith*, 994 F. Supp. 2d

77, 85 n.7 (D.D.C. 2013) (explaining that "to the extent the *Rose* ruling causes tension with

[*Environmental*] *Research*, it is in dicta only").[4]  The D.C. Court Appeals has since noted its

"conflicting messages about the conceptual basis for the [government contacts] doctrine," but

declined to resolve the conflict one way or the other.  *Akhmetshin v. Browder*, 275 A.3d 290, 293

(D.C. 2022).  Thus, as "[i]t is by no means established that the government contacts rule is in fact

limited to activities that implicate the First Amendment," *Robo-Team NA, Inc. v. Endeavor*

*Robotics*, 313 F. Supp. 3d 19, 25 (D.D.C. 2018), the Court follows the D.C. Circuit's guidance

against reading *Rose* to apply a categorical First Amendment limitation on the government

contacts exception.  *See Akhmestshin*, 275 A.3d at 294 (noting, without criticizing, the D.C.

Circuit's decision in *Naartex Consulting* to apply the "government contacts exception without

considering whether the exercise of jurisdiction based on those contacts would violate

defendants' First Amendment rights," notwithstanding *Rose*).  In turn, because the only contacts

between Ms. Richards and D.C. alleged by the Tribe fall squarely within the government

contacts exception, they do not provide a basis for the Court to exercise personal jurisdiction

over her.

---

[4] As indicated *supra* at 12, *Environmental Research* articulated the general rule that local courts may not "assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality."  *Env't Rsch. Int'l*, 355 A.2d at 813. The D.C. Circuit, citing a concurrence from the D.C. Court of Appeals' denial of a petition for rehearing *en banc* in *Rose*, went as far as to suggest that the *Rose* panel would have been without authority to materially alter the *en banc Environmental Research* court's decision.  *See Naartex Consulting Corp.*, 722 F.2d at 786 (explaining that "a panel of the District of Columbia Court of Appeals 'is prohibited from issuing an opinion which conflicts materially with a prior decision of [the full] court as this may be done only by the court sitting *en banc*'" (quoting *Rose v. Silver*, 398 A.2d 787, 787 (D.C. 1979)); *see also Rose*, 398 A.2d at 787 (Gallagher, J., concurring) ("The opinion in this case expressly disclaims that it conflicts with our prior en banc decision in [*Environmental Research*].").

**B.  Agency's Motion to Dismiss**

The Agency moves to dismiss for lack of standing.  *See* Agency's Mot. at 1.  Although the Complaint includes only one count for violation of the APA, it alleges that the agency committed two discrete illegal actions: (1) terminating the first PA; and (2) executing the second PA.  *See* Compl. ¶ 1 ("The termination of the first PA . . . was arbitrary and capricious. . . .  The attempt to form a second PA without tribal consultation by the FHWA was arbitrary and capricious agency action."); *see also id.* ¶¶ 6, 69, 72.  The Court addresses the Tribe's standing as to each claim in turn.

1.  Termination of First PA

The Tribe alleges two injuries from the Agency's termination of the first PA.  Compl. ¶ 8 (explaining the Tribe's "two-pronged injury").  First, the Tribe alleges that the termination "frustrated reliance interests the Tribe had in properties that were part of the first PA" to the tune of $896,250.  *Id.*  Second, the Tribe alleges that it "suffered procedural injury-in-fact because of the first PA due to the failure of the FHWA to follow regulations under the Section 106 process," specifically the failure to "provide a proper summary of its reasoning for the termination of the first PA (to all consulting parties and the public) that satisfied the requirements of 36 C.F.R. § 800.7(c)(4)."  *Id.* ¶ 9.  The Agency argues that the Tribe "fails to demonstrate either causation or redressability" as to these injuries.  Agency's Mot. at 8.  Specifically, as it did in the prior action, the Agency argues that "[a]ny injury to the Tribe is traceable only to Rhode Island."  *Id.*; *see Narragansett*, 2022 WL 782410, at *6.

To establish standing, "the injury has to be 'fairly . . . traceable to the challenged action of the defendant and not . . . the result of the independent action of some third party not before the court."  *Lujan v. Defs. of Wildlife*, 504 U.S. at 560 (citation and internal alterations omitted).

As such, "[w]hen a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004), *abrogation on other grounds recognized by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).  In that situation, "it becomes the burden of the plaintiff to adduce facts showing that [the third party's] choices have been or will be made in such manner as to produce causation and permit redressability of injury."  *Id.*

 The Agency argues that "Rhode Island refused to convey the disputed parcels to the Tribe unless the Tribe waived sovereign immunity" and that the "agreement's termination was simply a concession to the reality that Rhode Island was unwilling to convey the parcels to the Tribe free and clear."  Agency's Mot. at 8–9.  It also emphasizes, with citation to attached letters from the Agency to Rhode Island, that starting on September 1, 2016, the Agency attempted to compel Rhode Island to convey the parcels in accordance with the first PA by "inform[ing] Rhode Island that it would withhold all project funds to the state due to its defiance of the agreement."  Agency's Mot. at 4; *see id.* Exs. A–B, ECF No. 31-1.  The agency terminated the first PA approximately four and a half months later, on January 19, 2017.  Compl. ¶ 56.

 The Tribe responds not by disputing that Rhode Island refused to convey the parcels without a waiver of sovereign immunity, but rather by arguing that the Agency should have done more to compel it to do so.  Specifically, while the Tribe acknowledges that "the FHWA withheld funding on the Viaduct Project when the State refused to honor the executed agreement," it argues that the Agency did not "wait[] a sufficient time to see the result of their

threat." Pl.'s Opp'n to Agency's Mot. at 13.[5]  The Tribe does not identify what length of

withholding would have been "sufficient" or offer any support for its assertion that some longer

duration suddenly would have born fruit.  This "'unadorned speculation' as to the existence of a

relationship between the challenged government action and the third-party conduct will not

suffice to invoke the federal judicial power." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d

42, 50 (D.C. Cir. 2016) (quoting *Na'l Wrestling*, 366 F.3d at 938).[6]  The Tribe has not carried its

burden to show that the termination of the first PA was caused by the Agency and not the

independent actions of Rhode Island.

### 2.  Execution of Second PA

With respect to the execution of the Second PA, the Tribe claims injury from the

Agency's failure to consult it pursuant to 36 C.F.R. § 800.14(f).  *See* Compl. ¶ 10.  It explains

that this procedural injury caused harm to the Tribe's concrete interests in the form of

---

[5] The Tribe also makes cryptic references to the idea that the Agency should have simply taken the properties through "condemnation." Pl.'s Opp'n to Agency's Mot. at 5, 7, 9.  This issue is not raised in the Complaint and the Tribe offers no supporting factual allegations, so it has not met its burden to establish causation.  *See* Compl. ¶ 13 (claiming that the Agency should have continued to "withhold[] funding from the state" but making no mention of condemnation).  And as to redressability, the Agency cites to substantial authority for the proposition that "an agency may condemn property only if authorized to do so by Congress."  Agency's Mot. at 4 (collecting cases).

[6] Moreover, with respect to the Tribe's claimed procedural injury, it has not met its burden to show redressability.  While "[c]laims for procedural violations . . . receive a 'relaxed redressability requirement,'" the Tribe still has the burden to show that "correcting the alleged procedural violation *could* still change the substantive outcome in the plaintiff's favor[.]"  *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (cleaned up).  The Tribe offers no basis on which the Court could conclude that ordering a "proper summary" of the Agency's decision to terminate the first PA could, at this point, redress the alleged injury to its concrete interests from the termination.  *See Narragansett Indian Tribal Historic Preservation Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) ("[F]ixing the alleged defect in the Commission's regulatory procedures could not possibly prevent or mitigate the harm to the Narragansett Tribe's cultural or religious interests."); *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 954 (D.C. Cir. 2021) ("Petitioner must, at least, link a permissible court order to its concrete injury . . . .").

"unmitigated damage to the Viaduct properties." *Id.* ¶ 11.  Consultation, the Tribe alleges,

"could result in alternative mitigation measures that would adequately address harm to the

historic, tribal properties." *Id.* ¶ 12.  The Agency, in a terse three-sentence argument that the

Tribe lacks standing as to the execution of the second PA, claims that "such bald and conclusory

assertions do not meet the Tribe's burden to show that consultation would have caused the

agency to adopt alternative mitigation measures that would have adequately mitigated the harm

to the historic properties, or that reopening the new agreement for consultation would adequately

mitigate such harm."  Agency's Mot. at 10–11.[7]

The Agency misstates the Tribe's burden.  To establish causation for purposes of

standing based on a procedural injury, it is well-established that "[t]he plaintiff is not required to

'show that but for the alleged procedural deficiency the agency would have reached a different

substantive result.'"  *Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021) (quoting

*WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013)).  Rather, "[a]ll that is

necessary is to show that the procedural step was connected to the substantive result."  *Id.* at 224-

25 (citation omitted).  Similarly, with respect to the redressability prong of standing, "[c]laims

for procedural violations . . . receive a 'relaxed redressability requirement' in which the plaintiff

---

[7] The Agency's reply in support of its motion also raises for the first time an argument the Tribe's interests fall outside the zone of interests protected by Section 106.  It construes the Complaint as "argu[ing] that the Agency should have negotiated measures of greater private value to the Tribe."  Agency's Reply and Opp'n at 5, ECF No. 35.  From there, it argues that "enriching the Tribe is not a proper purpose of the Section 106 process," so the Tribe "has no 'legally protected interest' in a mitigation measure's private' value to it that can support an injury in fact."  *Id.* at 5–6.  But the agency only moves to dismiss "for lack of subject-matter jurisdiction," Agency's Mot. at 1, and "the zone of interests test is a merits issue" that "does not implicate subject-matter jurisdiction," *CSL Plasma, Inc. v. U.S. Customs and Border Protection*, 33 F.4th 584, 588 (D.C. Cir. 2022).  *See* Agency's Reply and Opp'n at 6 (citing *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) without noting the Circuit's explanation on the previous page that the zone of interest test is "*[i]n addition to* constitutional standing" and explores whether the plaintiff states a "valid cause of action").

need only show that 'correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor' not 'that it *would* effect such a change.'" *Id.* (quoting *Narragansett Indian Tribe Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020)).

The Tribe pleads enough here. It adequately alleges a procedural injury in the form of the Agency's failure to engage in the required consultation with the Tribe under 36 C.F.R. § 800.14(f) in developing the second PA. *See* Compl. ¶¶ 10–12. It adequately alleges that the procedural injury is "tethered to some concrete interest adversely affected by the procedural deprivation," *WildEarth Guardians*, 738 F.3d at 305; namely, harm from improper mitigation to "historic, tribal properties." Compl. ¶ 12; *cf. WildEarth Guardians*, 738 F.3d at 305–06 (finding environmental plaintiffs' alleged procedural injury from a deficient environmental impact report concerning a land lease project sufficiently tethered to "concrete aesthetic and recreational interests" in the land subject to increased "local air, water, and land pollution" from planned development pursuant to the leases). It adequately alleges that the Agency's alleged failure to consult with the Tribe was connected to that harm. *See* Compl. ¶ 11 ("In FHWA's attempt to create a second PA, the omission of the Tribe as a stakeholder and FHWA's failure to adequately consult with the Tribe resulted in unmitigated damage to the Viaduct properties affecting concrete interests of the Tribe."); *cf. Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (explaining that plaintiffs may establish standing based on a procedural injury if they live "near where the federal action would occur and would feel the environmental effects of that action if it went forward"); *Lujan*, 504 U.S. at 572 n.7 ("[O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any

certainty that the statement will cause the license to be withheld or altered").  Finally, the Tribe

adequately alleges that correcting the alleged failure to consult with the Tribe *could* change the

substance of the second PA's mitigation measures.  *See* Compl. ¶ 12 ("If the Tribe were

adequately consulted on the second PA, it could result in alternative mitigation measures that

would adequately address harm to the historic, tribal properties."); *cf. Wildearth Guardians*, 738

F.3d at 306 ("Vacatur of the [agency] order would redress [plaintiffs'] injuries because, if the

[agency] is required to adequately consider each environmental concern, it could change its mind

about authorizing the lease offering."); *Lemon*, 514 F.3d at 1315 ("[I]f the Secretary had taken

into account the effect of the new . . . redevelopment plan he might have placed conditions on the

transfer of the land . . . that might have ameliorated what plaintiffs see as damage to an historic

site they visit and enjoy").[8]  The Tribe has standing to pursue its claim as to the execution of the

second PA.

### C.  Motion to Compel Supplement to Administrative Record

The Tribe moves to compel the Agency to supplement the administrative record.  *See*

*generally* Pl.'s Mot. Suppl. Admin. Rec.  The motion is long and difficult to follow, but the

---

[8] While the Agency states that the "viaduct project's northbound lane opened to traffic on October 2022," it does not argue that additional mitigation measures would be impossible such that consultation with the Tribe could not still address the substantive harm alleged.  Instead, the Agency argues that the Tribe's assertion that consultation could have resulted in better mitigation is too speculative because the Tribe did not "even attempt to identify what those alternative mitigation measures might have been."  Agency's Mot. at 10; *see also* Agency's Reply at 2, ECF No. 35 ("[The Tribe's] argument that consulting it in forming a new agreement would have resulted (or that reopening the new agreement for consultation would result) in greater mitigation of harm to the historic properties is speculative and conclusory.").  But again, the Tribe need not show that consultation *would* result in a better outcome, only that it *could*.  Accordingly, as the Court does not understand the Agency to imply a closed universe in which the mitigation measures adopted in the second PA are the only theoretically plausible measures such that reopening consultation with the Tribe could not possibly affect the outcome, the persuasiveness of the Tribe's arguments for or against a particular measure is irrelevant.

Court interprets it to press four main arguments: (1) the administrative record compiled by the Agency should be presumed incomplete based on its limited size, *see id.* at 9; (2) the administrative record was inflated by duplicates intentionally included by the Agency to give the appearance of a more complete record, *see id.* at 14, 19; (3) the fact that the Tribe identified, and the Agency subsequently produced, certain records omitted from the administrative record shows that the Agency is acting in bad faith, *see id.* at 15–18; and (4) the Agency did not sufficiently explain redactions applied to eight documents, *see id.* at 8.

"[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (citation omitted).  Accordingly, courts "do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule." *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010).  The Court may order supplementation "[i]f for some reason, materials that were actually a part of the agency's record were not properly included, whether by design or accident," but it is the movant's burden to "overcome [the] strong presumption of regularity by putting forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." *The Cape Hatteras Access Preserv. Alliance v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114 (D.D.C. 2009); *see id*. at 112 ("A court that orders an administrative agency to supplement the record of its decision is a rare bird.").

The Tribe fails to carry that heavy burden here.  As to its first argument, that the Court should presume the administrative record incomplete "[o]n its face" based on the Tribe's expectation that "a $200 million highway project and a prolonged negotiation over the termination of a programmatic agreement that lasted nearly a decade" should have a more

extensive record,  Pl.'s Mot. Suppl. Admin. Rec. at 9, this speculative assertion does not amount to concrete evidence sufficient to defeat the strong presumption of regularity.  *See Am. Soc'y for Prevention of Cruelty to Animals v. Animal and Plant Health Inspection Serv.*, No. 21-cv-1600, 2023 WL 3073609, at *3 ("Simply asserting that [the agency] 'necessarily considered' the information sought does not, on its own, provide any concrete, non-speculative evidence that it did so.").  As to the Tribe's second argument, that the administrative record was inflated by duplicates, the Agency explains that "nothing requires the Agency to cull such duplicates" and points out that some redundancy is natural, as "if a document appears at multiple stages of agency proceedings, then removing the later copies can compromise the record's integrity." Agency's Reply and Opp'n at 11.  As the Tribe cites to no authority for the proposition that an Agency is required to remove duplicates from the record and points to no concrete evidence to overcome the presumption that any duplicates were properly included to reflect the Agency's consideration, the Court agrees with the Agency that the appearance of duplicates in the record does not demonstrate either that the administrative record is incomplete or that the Agency acted in bad faith.[9]

    The Tribe's third argument, that certain documents initially were omitted from the administrative record, has at least some specificity.  The Tribe explains that, based on responses to three document requests it sent to Rhode Island, it identified "fourteen documents that evidenced interaction with FHWA and ACHP that were also excluded from the Defendant's Administrative record[.]"  Pl.'s Mot. Suppl. Admin. Rec. at 14.  But the Agency explains, with citation to the certified list of the contents of the administrative record, that it "added all of these

---

[9] This finding is reinforced by the fact that the duplicates apparently only amount to 70 records.  *See* Pl.'s Mot. Suppl. Admin. Rec. at 7.

materials to the record as soon as the Tribe pointed out their omission" and "well before the Tribe moved to compel."  Agency's Reply and Opp'n at 9 (citing the materials from the Certified List, ECF No. 30).  The Tribe concedes that the relevant documents were added, Reply Supp. Pl.'s Mot. Suppl. Admin. Rec. at 4–5, ECF No. 37, but disputes that the Agency was prompt or cooperative in doing so and argues by insinuation that the fact of their addition amounts to concrete evidence that the record is incomplete, *see id.* at 22 (referring the omission of the documents as a "plot" that "could allow the FHWA to hide its reasoning and apparent agreement with the state that the adverse effects to the properties could be mitigated by a second PA without the tribe as a stakeholder or consulting party").[10]  But the mere fact that the Agency voluntarily supplemented the record with additional documents provides no occasion to question its good faith or to presume the record incomplete.  *See Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008) ("Plaintiff's implication that because the [agency] has already agreed to supplement the record with additional documents, including some that were disclosed only as a result of plaintiff's FOIA request, other relevant documents that should be added to the record must exist is simply not enough."); *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (finding that the Corps' voluntary agreement to supplement the record with three of the nineteen documents requested by the plaintiff was sufficient, as the plaintiff "cannot meet its burden simply by asserting that the [rest of the] documents are relevant, were before or in front of the Corps at the time it made its

---

[10] The Tribe asserts that the Agency failed to provide PDFs of the files, so it could not verify their contents at the time it filed its motion.  *See* Pl.'s Mot. Suppl. Admin. Rec. at 14.  The Agency disputes that, and the Tribe's own submission also seems to contain indications to the contrary.  *See* Agency's Reply and Opp'n at 10; Pl.'s Mot. Suppl. Admin. Rec. at 15 (discussing the substance of the "excluded" documents).  Regardless, there is no dispute that the Tribe is in possession of the records now, so the dispute over timing is immaterial.

decision, and were inadequately considered"); *cf. Pub. Citizen v. Dep't of State*, 276 F.3d 634,

645 (D.C. Cir. 2002) (explaining, in the FOIA context, that "we have previously declined to find

subsequent disclosure as evidence of bad faith").

Finally, the Tribe's fourth argument, that the Agency did not sufficiently explain

redactions to eight documents, is similarly unsuccessful.  The Agency explains that these

materials were redacted "under the attorney-client and deliberative process privileges."

Agency's Reply and Opp'n at 12.   While the Tribe sees the Agency's failure to prospectively

provide explanations justifying these redactions as evidence of bad faith, "privileged and

deliberative materials are not part of the administrative record as a matter of law[.]"  *Stand up for*

*Cal.! v. U.S. Dep't of Interior*, 71 F. Supp. 3d 109, 123 (D.D.C. 2014).  Accordingly, "to obtain a

log of privileged and deliberative materials excluded from the administrative record, plaintiffs

must overcome, with clear evidence, the presumption of regularity in the agency proceedings by

showing bad faith or other exceptional circumstances."  *Id.*  As the Tribe points to no evidence to

overcome the presumption of regularity as to these redactions beyond their mere existence, it has

not overcome the presumption of regularity.  *See Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't*

*of Health and Human Servs.*, 631 F. Supp. 2d 23, 28 (D.D.C. 2009) ("Since the agency is entitled

to a presumption that it has properly designated the documents, and no bad faith or improper

motive has been alleged or proven, defendants are not required to provide plaintiffs with a

privilege log detailing the documents.").  The Tribe has not established that it is entitled to an

order compelling the Agency to supplement the administrative record.

## V.  CONCLUSION

For the foregoing reasons, State Defendants' Motion to Dismiss (ECF No. 18) is

**GRANTED**, the Agency's Motion to Dismiss (ECF No. 31) is **GRANTED IN PART AND**

**DENIED IN PART**, and the Tribe's Motion to Supplement the Administrative Record (ECF No. 33) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 27, 2023                                                          RUDOLPH CONTRERAS
                                                                               United States District Judge