# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| NARRAGANSETT INDIAN TRIBE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 22-2299 (RC) |
| | : | | |
| v. | : | Re Document No.: | 42, 43 |
| | : | | |
| SHAILEN BHATT, Administrator, | : | | |
| Federal Highway Administration, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-
MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The Narragansett Indian Tribe, acting by and through the Narragansett Indian Tribal

Historic Preservation Office (the "Tribe"), brings this action against Shailen Bhatt, in his official

capacity as Administrator of the Federal Highway Administration (the "Agency") challenging

the Agency's actions in connection with a highway bridge-building project in Providence, Rhode

Island.  The National Historic Preservation Act ("NHPA" or the "Act"), codified at 54 U.S.C.

§ 300101 *et seq*., requires that federal agencies "take into account" the preservation of historic

sites when implementing federal projects.  The Tribe contends that the Agency violated the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* by failing to comply with the

requirements set forth in the NHPA.  The parties have now filed respective motions for summary

judgment.  *See generally* Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 42-1; Def.'s Cross Mot.

Summ. J. ("Def.'s Cross-MSJ"), ECF No. 43-1.  For the reasons explained below, the Court

denies the Tribe's motion for summary judgment and grants the Agency's cross-motion for summary judgment.

## II.  BACKGROUND[1]

### A.  Statutory and Regulatory Framework

The NHPA requires that federal agencies "take into account" the preservation of historic sites when implementing federal projects.  54 U.S.C. § 306108 (requiring that any federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . prior to the approval of the expenditure of any Federal funds on the undertaking . . . shall take into account the effect of the undertaking on any historic property.").  This requirement is often referred to as the "Section 106" process.  *See* 36 C.F.R. §§ 800.3 to 800.13 (titled "the Section 106 Process").  The Advisory Council on Historic Preservation (the "Advisory Council") is the agency responsible for issuing regulations that implement the Section 106 process.  36 C.F.R. § 800.2(b); *see United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 734 (D.C. Cir. 2019).  Those regulations, codified at 36 C.F.R. § 800 *et seq*., lay out the steps an agency must take to comply with the NHPA's requirement to "take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108.

The NHPA's implementing regulations explain that "[t]he [S]ection 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning."  36 C.F.R. § 800.1(a).  Section 106's requirements may be satisfied either by a standard consultation

---

[1] This section draws heavily on the background section in *Narragansett Indian Tribe by & through Narragansett Indian Tribal Historic Pres. Off. v. Pollack*, No. 22-cv-2299, 2023 WL 4824733, at *1 (D.D.C. July 27, 2023) ("*Narragansett 2023*").

procedure or certain permitted alternatives called "program alternatives."  *See* 36 C.F.R. §§ 800.3–800.16.

As relevant here, one program alternative to the standard Section 106 process is the development of a "programmatic agreement."  *See* 36 C.F.R. § 800.14(b).  Programmatic agreements "govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings."  *Id.*  Before implementing a programmatic agreement, the federal agency must consult with appropriate stakeholders, usually including state historical preservation officers and Indian tribes.  *Id.* §§ 800.14(b)(2)(i), (f).

Programmatic agreements take effect when executed by the "appropriate" stakeholders. *Id.* § 800.14(b)(2)(iii).  For instance, for a programmatic agreement to take effect on tribal lands, "the tribe, or a designated representative of the tribe" must be a "a signatory to the agreement" before the agreement can be executed.  *Id.*  Relatedly, the "[t]ermination [of a programmatic agreement] by [a tribe] shall only terminate the application of a regional programmatic agreement within the jurisdiction of the [tribe]."  *Id.*  "Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings . . . covered by the agreement."  *Id.*  An approved programmatic agreement satisfies an agency's Section 106 responsibilities "until it expires or is terminated by the agency . . . or [the Advisory Council]."  *Id.*

Section 106 does not dictate substantive results.  Instead, Section 106 is a procedural statute requiring a federal agency to take certain steps prior to beginning a project.  *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003) ("An essentially procedural statute, [S]ection 106 imposes no substantive standards on agencies, but it does require them to solicit

[the Advisory Council's] comments and to take into account the effect of [their] undertakings." (cleaned up)); *United Keetoowah Band of Cherokee Indians*, 933 F.3d at 734 ("The Section 106 process requires that an agency 'consider the impacts of its undertaking' and consult various parties, not that it necessarily 'engage in any particular preservation activities.'" (citation omitted)).  Thus, provided that an agency fulfills the requirements set forth by Section 106 and its attendant regulations, the Agency may choose among reasonable alternatives to achieve its desired ends.  *See generally* 36 C.F.R. §§ 800.14(f)(2), 800.16(f) (requiring agencies to consult and "where feasible" seek agreement among stakeholders, but not requiring agency to adopt any specific result).

### B.  Factual and Procedural History

The Court assumes familiarity with the procedural history described in *Narragansett 2023*, 2023 WL 4824733, and will relate only those details that are relevant at this stage in the proceedings.  The facts leading to this case began when the Agency sought to provide funding to the State of Rhode Island (the "State" or "Rhode Island") for the replacement of the I-95 Viaduct Bridge located in Providence, Rhode Island.  *See id.* at *2; *see also* Administrative Record ("AR") at 000968, ECF No. 50.[2]  To comply with its obligations under the NHPA, the Agency investigated whether the bridge's construction would affect historic properties.  *See Narragansett 2023*, 2023 WL 4824733, at *2.  The Agency determined that the construction would result in adverse effects to historic properties in the Providence Covelands Archaeological District and decided to pursue a programmatic agreement to mitigate the harms to the historic properties.  *Id.* As mitigation for the harmful effects of the bridge construction, the agency's programmatic

---

[2] For ease of reference, the Court cites to the Administrative Record, ECF Nos. 49 and 50 using the abbreviation "AR" followed by the bates number at the bottom of each page of the Administrative Record.

agreement required Rhode Island to transfer to the Tribe ownership of three parcels of land that had historic, cultural, and religious significance to the Tribe (the "Mitigation Properties").  *Id.*

Construction began on the I-95 Viaduct Bridge project in June 2013.  *Id.*  But after the southbound lane of the bridge was constructed, the State reneged on the programmatic agreement.  *Id.* at *2–3.  In short, Rhode Island refused to transfer the Mitigation Properties to the Tribe unless the Tribe agreed to waive its sovereign immunity with respect to the Mitigation Properties.  *Id.*  Although the Agency attempted to convince Rhode Island to transfer the Mitigation Properties without the Tribe's waiver of sovereign immunity, the Agency was ultimately unable to force the State to comply with the terms of the programmatic agreement.  *See* AR at 001001.  The Court notes that the programmatic agreement did not require the Tribe to waive its sovereign immunity and, as a sovereign nation, the Tribe justifiably refused to do so.[3]  Confronted with this impasse, the Agency eventually terminated the programmatic agreement even though construction on the southbound lane had already been completed.  *See* AR at 001001.

After receiving and considering comments from the Advisory Council, the Agency decided to reinitiate the Section 106 consultation process with respect to the I-95 Viaduct Bridge construction project and draft a new programmatic agreement.  *See* AR at 001001.  When drafting the second programmatic agreement, the Agency outlined new mitigation items to address the adverse effects of the construction project.  *See* AR at 000970.  In lieu of transferring

---

[3] The NHPA regulations specify that "Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty," "[n]othing in this part alters, amends, repeals, interprets, or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies, or limits the exercise of any such rights," and that "[c]onsultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes."  *See* 36 C.F.R. § 800.2(c)(2)(ii)(B)–(C).

the Mitigation Properties to the Tribe for preservation, the second programmatic agreement proposed that Rhode Island would implement an academic-level historic context document about the Tribe, a video documentary about the Tribe, Section 106 training for the Tribe, a teaching curriculum for Rhode Island public schools about the Tribe, and that the State would possess and preserve the Mitigation Properties itself.  *See* AR at 000970–000976.

The Tribe found these mitigation measures offensive and unacceptable and therefore objected vehemently to the proposed second programmatic agreement.  *See*, *e.g.*, AR at 000272–000273.  In the Tribe's view, it was insulting for the Agency to suggest that the State's facilitation of a documentary and academic study of the Tribe could be appropriate mitigation because the Tribe was already aware of its own history.  *See* Pl.'s MSJ at 7 n.4.  The Tribe also found the suggestion that the State provide Section 106 training to be insulting given the Tribe's lengthy experience with the Section 106 process.  *Id.*  Nevertheless, the Agency ultimately concluded that these mitigation measures were appropriate to address the harms to the historic properties affected by the bridge construction project and finalized a second programmatic agreement with these mitigation measures.  *See* AR at 000970–000976.  The Tribe ultimately chose not to sign onto the second programmatic agreement.  *See* AR at 000970–000976.

After the second programmatic agreement was executed, the Tribe sued the Agency and the State of Rhode Island.  *See generally* Compl., ECF No. 1. Earlier in this litigation the defendants moved to dismiss.  *See generally* State of Rhode Island Mot. Dismiss, ECF No. 18; Agency Mot. Dismiss, ECF No. 31.  The Court granted Rhode Island's motion to dismiss for lack of personal jurisdiction and granted in part and denied in part the Agency's motion to dismiss based on standing.  *See Narragansett 2023*, 2023 WL 4824733.  In particular, the Court previously held that the Tribe lacked standing to challenge the Agency's termination of the initial

programmatic agreement but held that the Tribe had "standing to pursue its claim as to the execution of the second [programmatic agreement]." *See id.* at *9. The Tribe and the Agency have now filed respective motions for summary judgment and their motions are ripe for review.

### III.  LEGAL STANDARD

Summary judgment is ordinarily appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). But when, as here, the Court reviews a final agency action under the Administrative Procedure Act ("APA"), the standard set forth in Rule 56(a) does not apply. *See Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012). Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 198 (D.D.C. 2011) (internal quotation marks and citations omitted). This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (when assessing motion for summary judgment in APA case "the district judge sits as an appellate tribunal").

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Desa Grp., Inc. v. U.S. SBA.*, 190 F. Supp. 3d 61, 68 (D.D.C. 2016).  This standard requires the agency to "examine the relevant [evidence]" and "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).  But the agency's explanation need not be "a model of analytic precision to survive a challenge." *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (internal quotation marks omitted).  Courts "must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 248 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part) (emphasis added) (internal quotation marks omitted).

Agency action is also considered arbitrary and capricious if the Agency fails to comply with its relevant regulations.  *See Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014).  And courts "will set aside agency actions that are adopted 'without observance of procedure required by law.'" *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 781 (9th Cir. 2006); *Pharm. Rsch. & Manufacturers of Am. v. Fed. Trade Comm'n*, 44 F. Supp. 3d 95, 113 (D.D.C. 2014) (reviewing court may hold unlawful and set aside agency action undertaken "without observance of procedure required by law" (quoting 5 U.S.C. § 706(2)(D)).

## IV.  ANALYSIS

The arguments raised in the parties' cross motions for summary judgment involve two primary disputes: (1) whether the Tribe has standing to bring this suit against the Agency, and (2) whether the Agency complied with relevant statutory and regulatory requirements in crafting and executing the second programmatic agreement.  Because standing is a jurisdictional question, the Court addresses it first.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89

(1998); *see also McBride v. Mnuchin*, No. 19-cv-60, 2019 WL 3323412, at *2 (D.D.C. July 24,

2019) ("Before addressing the merits of a case, a court must confirm that it has subject matter

jurisdiction." (internal citation omitted)).

### A. Standing

The Agency argues that the Tribe lacks standing because the Tribe cannot show that the

Agency caused its injury or that its injury is redressable.  *See* Def.'s Cross-MSJ at 15.  Standing

is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and therefore is "a necessary 'predicate to any

exercise of [Article III courts'] jurisdiction.'"  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361

(D.C. Cir. 2012) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en

banc)).  "[E]ach element of Article III standing must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation." *Bennett v. Spear*, 520 U.S. 154,

167–68 (1997) (quotation marks and citation omitted).  Therefore, the Court must ensure that the

Tribe has standing at the summary judgment stage even if the Court previously concluded that

the Tribe had standing at the motion to dismiss stage.  *See Lujan*, 504 U.S. at 561.  In other

words, at the summary judgment stage "the plaintiff can no longer rest on . . . 'mere

allegations,'" but must instead point to specific facts that are acceptable as evidence at this stage

of the litigation to prove it has standing.  *Id.* (quotation marks and citation omitted).

As relevant here, one component of Article III standing is traceability.  *See Hawkins v.*

*Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021).  "To establish traceability in a procedural-injury

case, an adequate causal chain must contain at least two links: (1) a connection between the

omitted procedure and a government decision and (2) a connection between the government

decision and the plaintiff's particularized injury." *Id.* (quotation marks and citation omitted);

*Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1169 (D.C. Cir. 2023) (holding that party

asserting procedural injury "must show both (1) that [its] procedural right has been violated, and

(2) that the violation of that right has resulted in an invasion of [its] concrete and particularized

interest" (quotation marks and citation omitted)).  While a Plaintiff need not demonstrate that

using the appropriate procedure "would"—as opposed to "could—lead to a different government

decision," *see Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022) ("As to

causation, a party asserting procedural injury never has to prove that if he had received the

procedure the substantive result would have been altered." (quotation marks and citation

omitted)); *Narragansett 2023*, 2023 WL 4824733, at *9 ("[I]t is well-established that the

plaintiff is not required to show that but for the alleged procedural deficiency the agency would

have reached a different substantive result." (cleaned up)), a plaintiff must demonstrate that the

government's "action was the cause of some redressable injury to the plaintiff," *Hawkins*, 991

F.3d at 225.

   A separate and essential component of Article III standing is redressability.  "The

redressability requirement is relaxed for procedural-rights plaintiffs."  *Eagle Cnty.*, 82 F.4th at

1171.  "Typically, redressability is absent only when the Court's decision would have 'no real

effect' on the plaintiff's injury."  *Cherokee Nation v. United States Dep't of the Interior*, 643 F.

Supp. 3d 90, 106 (D.D.C. 2022).  To satisfy the redressability requirement, a plaintiff must show

that "correcting the alleged procedural violation *could* . . . change the substantive outcome in the

plaintiff's favor," but a plaintiff need not show "that it *would* effect such a change."

*Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020)

(emphasis original).  Even if there were a "serious possibility" that the Agency would not change

its decision if it followed the appropriate process, so long as "there remains at least the possibility that it could reach a different conclusion," the Tribe's injury is redressable. *See Eagle Cnty.*, 82 F.4th at 1171.

### 1. Traceability

The Court starts with whether the Tribe's injury is traceable to the Agency's actions.[4] Here, the Tribe claims a procedural injury from the Agency's failure to consult it pursuant to 36 C.F.R. § 800 *et seq*, and it argues that this procedural injury caused harm to the Tribe's concrete interests in the form of damage to historic, cultural, and religious tribal property. *See* Pl.'s MSJ at 14 (arguing that Agency's "failure to adequately consult with the Tribe again resulted in unmitigated damage to the Viaduct properties affecting concrete interest of the Tribe."). When assessing causation, the Court "must assume" that the Tribe "will prevail on the merits." *Eagle Cnty.*, 82 F.4th at 1170.

Assuming that the Tribe is correct on the merits that the Agency unlawfully failed to consult with and obtain the Tribe's consent prior to the execution of the second programmatic

---

[4] Neither party appears to question that the Tribe has an injury-in-fact due to the harm to the historic, cultural, and religious properties affected by the I-95 Viaduct Bridge project. And, as it concluded in *Narragansett 2023*, the Court concludes once again that the Tribe has a concrete injury—"namely, harm from improper mitigation to 'historic, tribal properties.'" 2023 WL 4824733, at *9; *c.f. WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (finding environmental plaintiffs' alleged procedural injury from a deficient environmental impact report concerning a land lease project sufficiently tethered to "concrete aesthetic and recreational interests" in the land subject to increased "local air, water, and land pollution" from planned development pursuant to the leases); *c.f. Pit River Tribe*, 469 F.3d at 779 (holding that tribe had standing because it used historic property in question for cultural and religious ceremonies); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 301 F. Supp. 3d 50, 61 (D.D.C. 2018) (averments of tribe members' past use of an area combined with averments that a federal undertaking would interrupt such use was sufficient to establish injury in fact); *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017) ("A concrete interest implicated by a procedural requirement may reflect aesthetic, conservational, and recreational values and does not need to be an economic harm." (quotation marks and citation omitted)).

agreement, that failure "was plainly connected to" the Agency's ultimate decision to execute the second programmatic agreement and the mitigation measures therein. *Id.* at 1170–71 (cleaned up); *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 n. 3 (9th Cir. 2018) (concluding that tribe had standing assuming that agency failed to comply with Section 106 procedure and that failure caused agency decision approving activities that harmed tribe's religious and cultural interests); *Mattis*, 868 F.3d at 817 ("[T]he question is whether the action the Government took . . . satisfied NHPA."). Had the Agency been required to obtain the Tribe's consent and conduct additional consultation with the Tribe before executing the second programmatic agreement, as the Tribe contends was required, the Agency *could* have arrived at a different substantive decision. *See Eagle Cnty.*, 82 F.4th at 1169. For instance, the Agency could have determined that alternative mitigation was appropriate to address the harm to the historic sites. *See* Pl.'s Reply at 15–16, ECF No. 46 (arguing that the Agency did not consider alternative mitigation options such as preservation of "other historic tribal properties" or funding to "restore current historic properties"); *see also* AR at 000136 (Agency referencing option of providing the Tribe funds so that the Tribe could "develop their own methods of mitigation for the impacts of the Providence Viaduct construction"). Accordingly, the Court concludes—for purposes of assessing standing—that the Tribe has a procedural injury in the form of the Agency's failure to consult it as required by the NHPA's implementing regulations.

The second question is whether the Tribe can connect the Agency's "substantive decision" regarding the second programmatic agreement "to [the Tribe's] particularized injury." *Eagle Cnty.*, 82 F.4th at 1169. Although the Tribe's briefing is not a model of clarity on this issue, the Tribe sufficiently demonstrates that the Agency's substantive decision is connected to its concrete injury. In particular, the Agency's substantive decision to adopt the mitigation items

in the second programmatic agreement resulted in the allegedly inadequate mitigation of the harm to the Tribe's interest in the historic properties affected by the construction of the I-95 Viaduct Bridge. *See* AR at 000270, 000970. Throughout the administrative record, the Tribe informed the Agency that the mitigation measures adopted by the agency in the second programmatic agreement do not mitigate the harm caused by the bridge's construction. *See, e.g.*, AR at 000273 ("To say these proposed mitigation items do not respond to the severity of the adverse effects that the Viaduct Project has already had on, and will have on the culturally and religiously significant Providence Coveland sites is an understatement."); AR at 000875, 000882. "The [Tribe] therefore demonstrates the second causal link, because there is a substantial probability that" the bridge's construction without appropriate mitigation due to the insufficient consultation negatively affected the Tribe's interest in the preservation of its historical, cultural, and religious "resources and historic properties." *Eagle Cnty.*, 82 F.4th at 1171.

### 2. Redressability

The Tribe can also show redressability. This is so because the Tribe adequately demonstrates that correcting the alleged failure to consult with the Tribe *could* lead the Agency to "reach a different conclusion." *Id.*; *Narragansett 2023*, 2023 WL 4824733, at *9 (holding that redressability requires that "correcting the alleged failure to consult with the Tribe *could* change the substance of the second [programmatic agreement's] mitigation measures"); *see also Havasupai Tribe*, 906 F.3d at 1162 (concluding that tribe's injury could be redressed by setting aside agency approval that harmed tribe's religious and cultural interest in property); *Mattis*, 868 F.3d at 818 ("Plaintiffs alleging procedural injury can often establish redress[a]bility with little difficulty, because they need to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain

from taking a certain action." (citation omitted)).  If the Court requires the Agency to consult further and obtain the Tribe's consent before executing the second programmatic agreement, it appears evident that those requirements *could* lead the Agency to adopt different mitigation measures.  *See Narragansett 2023*, 2023 WL 4824733, at *9; *see also Pit River*, 469 F.3d at 779 (concluding that tribe's injury from agencies' failure to follow appropriate process was redressable because court could hold the agencies' process to be inadequate and "the agencies would have to correct the decision-making process." (cleaned up)); *Wishtoyo Found. v. United States Fish & Wildlife Serv.*, No. 19-cv-03322, 2019 WL 8226080, at *7 (C.D. Cal. Dec. 18, 2019) (concluding that injury was redressable because "[g]iven the detailed procedural requirements imposed by the NHPA's implementing regulations, consulting with interested parties . . . could certainly influence the [Agency's] decision").  For instance, the Agency could decide that alternative properties should be managed by the Tribe as mitigation, that the Tribe should receive funding to develop its own mitigation measures, or that some other form of mitigation is appropriate.  After all, the administrative record reveals that the Agency previously considered alternative mitigation, such as providing the Tribe with funds so that the Tribe could "develop their own methods of mitigation for the impacts of the Providence Viaduct construction."  AR at 000136.  And the fact that the State refused to transfer the Mitigation Properties does not indicate that other properties could not be managed by the Tribe or that alternative mitigation strategies are not possible.

The Agency counters that the Tribe cannot demonstrate redressability because it has not identified mitigation measures that could redress the Tribe's harm.  *See* Def.'s Cross-MSJ at 17–19.  In particular, the agency says that (1) it could not cause the transfer of the properties that the Tribe wants transferred, (2) the properties the Tribe wants to preserve are already being

preserved by the State and the Tribe has not demonstrated that it would do a better job of preservation than the State, (3) the Tribe does not suggest other properties for preservation, and (4) the preservation of other properties would not mitigate the harm to the historic properties affected by the building of the I-95 Viaduct Bridge.  *See id.*

To begin with, the transfer of the Mitigation Properties is not the only alternative mitigation possible, so the fact that the Agency cannot cause the transfer of those properties is irrelevant.  *See Narragansett 2023*, 2023 WL 4824733, at *9 (explaining that possible mitigation measures are not a "closed universe").  As explained above, the Tribe must simply show that "correcting the alleged procedural violation *could* still change the substantive outcome in the [Tribe's] favor."  *Narragansett*, 949 F.3d at 13.  So long as "there remains at least the possibility that [the Agency] could reach a different conclusion," the Tribe's injury is considered redressable.  *See Eagle Cnty.*, 82 F.4th at 1171.  Here, alternative mitigation could include a greater role for the Tribe in preserving the historic properties, even if the State maintains title. Alternative mitigation could also include funding for the Tribe to independently pursue its own mitigation measures.  *See* AR at 000136 (Agency considering funding Tribe to "develop their own methods of mitigation for the impacts of the Providence Viaduct construction.").  Contrary to the Agency's contention, these options are not speculative; their adoption would mitigate the Tribe's injury caused by the I-95 Viaduct Bridge construction because they would provide the Tribe with some additional means of preserving its cultural and religious history.  And those mitigation options show that "correcting the alleged procedural violation *could* still change the substantive outcome in the [Tribe's] favor."  *Narragansett*, 949 F.3d at 13.

As for the Agency's argument that the Mitigation Properties are already being preserved and that transferring these or other properties to the Tribes is unnecessary, *see* Def.'s Cross-MSJ

at 17; Def.'s Reply at 8, ECF No. 48, the administrative record reflects that there is a substantive difference between the State's management of those properties and the Tribe's management.  As explained by the Advisory Council, "[g]iven . . . the tribe's ancestral ties to these properties, the tribe is uniquely positioned to interpret these properties and ensure they are maintained and protected in a way that ensures their long-term preservation."  *See* AR at 00175.

Additionally, the fact that the Tribe has not suggested other properties for preservation is not dispositive; the Tribe need only show that correcting the alleged procedural violation could change the Agency's decision in its favor.  *See Narragansett*, 949 F.3d at 13.  As the Court explained in its earlier opinion, "the Tribe need not show that consultation *would* result in a better outcome, only that it could."  *Narragansett 2023*, 2023 WL 4824733, at *9 n.8.  Because the preservation of the Mitigation Properties is not the "only theoretically plausible measure[] such that reopening consultation with the Tribe could not possibly affect the outcome, the persuasiveness of the Tribe's arguments for or against a particular measure is irrelevant."  *Id.* Indeed, the Agency previously considered preservation of at least one other property to mitigate the effects of the bridge project.  *See* AR at 001330 (determining that "Site of the Great Swamp Fight Memorial/Monument" was "no longer viable to acquire").  Relatedly, the Agency's argument that the preservation of one property cannot remedy harm to another is misguided.  *See* Def.'s Cross-MSJ at 17; Def.'s Reply at 4.  The Agency's argument runs counter to the entire framework of the Section 106 process, which is designed to remedy harm caused to historic properties by providing mitigation measures such as the preservation of alternative historic sites. Even if the mitigation provided through the Section 106 process does not *undo* the damage to the original historic property, it can *remedy* that damage by preserving other historic sites; and that "ability to effectuate a partial remedy satisfies the redressability requirement."  *Uzuegbunam v.*

*Preczewski*, 592 U.S. 279 (2021) (internal quotation omitted).  The harm to the Tribe here is the loss of a historical, cultural, and religious resource; the preservation of a different historical, cultural, and religious resource can mitigate, if not completely rectify, that harm.  *See Cherokee Nation*, 643 F. Supp. 3d at 106 ("[T]he likelihood of even partial redress is enough to support standing.").  And the fact that the Agency itself suggested the preservation of the Mitigation Properties to mitigate harms to historic properties affected by the bridge construction demonstrates that preservation of other properties can be used to at least mitigate, if not completely redress those harms.  Accordingly, the Court concludes that the Tribe has demonstrated that it has standing with respect to its claim against the Agency for the execution of the second programmatic agreement.

## B.  Section 106

The crux of this case turns on the requirements of Section 106 of the NHPA and its implementing regulations.  As explained above, Section 106 mandates that federal agencies undertake a review process for all federally funded and permitted projects that will impact certain historic sites.  The Tribe contends that the Agency violated Section 106's requirements in two related ways.  First, the Tribe argues that the Agency did not sufficiently consult with the Tribe as required by Section 106.  *See* Pl.'s MSJ at 2, 14–16, 22.  Second, the Tribe contends that the Agency did not obtain the Tribe's consent as a signatory to the second programmatic agreement before executing that agreement.  *See id.* at 6–7, 14–15, 30–31, 34.  The Court will address the Tribe's signatory requirement argument first.

### 1.  Signatory Requirement

The Tribe appears to argue that it was a required signatory party to the second programmatic agreement and that under the NHPA's implementing regulations the second

programmatic agreement should not have been executed without the Tribe's consent.  *See* Pl.'s MSJ at 3, 6–7, 10, 14–16, 34; Pl.'s Reply at 4–5, 7–8.  The Tribe misunderstands the NHPA regulations' requirements for a programmatic agreement as it applies to the Agency's decisions regarding mitigation of the I-95 Viaduct Bridge project.

Generally speaking, "Section 106 of the Historic Preservation Act is a 'stop, look, and listen' provision."  *Eagle Cnty.*, 82 F.4th at 1189.  That said, the Tribe is correct that programmatic agreements, which are one alternative to the standard Section 106 process, *do* require execution by certain stakeholders.  *See* 36 C.F.R. § 800.14(b)(2)(iii) ("The programmatic agreement shall take effect when executed by the Council, the agency official and the appropriate [State Historic Preservation Officers]/[Tribal Historic Preservation Officers].").  But the required stakeholders for the execution of a programmatic agreement depend on the location of the property mitigated by the programmatic agreement.  In particular, both the NHPA's implementing regulations as well as the Advisory Council's guidelines clarify that tribal approval is *required* for the execution of a programmatic agreement only when the affected historic site is located on tribal lands.

The Court starts with the text of 36 C.F.R. § 800.14(b)(2)(iii).  The first sentence of that provision states that a "programmatic agreement shall take effect when executed by the Council, the agency official and the *appropriate* [State Historic Preservation Officers]/[Tribal Historic Preservation Officers] when the programmatic agreement concerns a specific region."  36 C.F.R. § 800.14(b)(2)(iii) (emphasis added).  The first sentence's reference to a "specific region" indicates that the location of the programmatic agreement governs whether the appropriate party or parties to a specific programmatic agreement are State or Tribal Historic Preservation Officers.  *Id.*  The second sentence of the provision further sheds light on who the "appropriate"

party or parties are—whether that be a State Historic Preservation Officer or a Tribal Historic

Preservation Officer.  This is so because the second sentence explains that "[a] programmatic

agreement shall take effect on tribal lands *only* when the [Tribal Historic Preservation Officer],

Indian tribe, or a designated representative of the tribe is a signatory to the agreement."  *Id.* §

800.14(b)(2)(iii) (emphasis added).  The regulation's prohibition on the execution of

programmatic agreements on tribal land without a tribal representative as a signatory logically

indicates that a tribal signatory is not required where the programmatic agreement does not take

effect on tribal land.  *See Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1136–37 (D.C. Cir.

2022) (applying the *expressio unius* canon of construction and explaining that "where the context

shows that the draftsmen's mention of one thing, like a grant of authority, does really

necessarily, or at least reasonably, imply the preclusion of alternatives, the canon is a useful

aide" (cleaned up)).  Under the *expressio unius* canon, the regulation's expression of an explicit

limitation on tribal land implies an absence of that limitation on non-tribal land.

Relatedly, if—as the Tribe contends—a tribe's role as a signatory were required any time

a programmatic agreement had the potential to affect "historic properties of religious and cultural

significance to an Indian tribe," 36 C.F.R. § 800.14(b)(2)(i), the explicit prohibition on the

execution of agreements when a programmatic agreement takes place on tribal lands would be

surplusage.  This is so because a Tribe's agreement would already be required whenever a

programmatic agreement took affect on tribal land, and therefore, the second sentence would

have no additional affect.  If possible, "a statute ought, upon the whole, to be so construed that, if

it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."

*Nasdaq*, 38 F.4th at 1137 (cleaned up).  Here, it is possible to avoid making the second sentence

of the statute superfluous by interpreting the regulation to require a tribal signatory *only* when

the programmatic agreement affects tribal land.  Accordingly, both the *expressio unius* canon and the surplusage canon lead to the conclusion that the regulation does not require a tribal signatory where a programmatic agreement does not affect tribal land.  And as the D.C. Circuit has observed, "the canon against surplusage and the *expressio unius* canon are at their zenith when they apply in tandem, as they appear to do here."  *Id.*(internal quotation marks and citation omitted).

This reading is further bolstered by the last two sentences of § 800.14(b)(2)(iii).  The provision specifies that the termination of a programmatic agreement "by an individual [State Historic Preservation Officer] / [Tribal Historic Preservation Officer] shall only terminate the application of a regional programmatic agreement within the jurisdiction" of that officer.  36 C.F.R. § 800.14(b)(2)(iii).  This sentence means that a tribe only has authority to terminate an agreement within the tribe's jurisdiction—*i.e.*, on tribal lands.  By the same token, if a tribe may only terminate a programmatic agreement on tribal lands, it stands to reason that a tribe is only required for the execution of a programmatic agreement in the first instance if that agreement pertains to tribal lands.  Relatedly, the final sentence of § 800.14(b)(2)(iii) specifies that if a Tribal Historic Preservation Officer "assumes the responsibilities of a [State Historic Preservation Officer] pursuant to section 101(d)(2) of the act and the [State Historic Preservation Officer] is signatory to [the] programmatic agreement, the [Tribal Historic Preservation Officer] assumes the role of a signatory, including the right to terminate a regional programmatic agreement on lands under the jurisdiction of the tribe."  *Id.*  This sentence implies that *either* a State Historic Preservation Officer *or* a Tribal Historic Preservation Officer must act as a signatory, but that a tribal officer is required as a signatory only where that tribal officer has taken the place of the State Historic Preservation Officer.  And tribal officers assume the

responsibilities of state officers only on tribal lands.  *See* 54 U.S.C. § 302702 ("An Indian tribe

may assume all or any part of the functions of a State Historic Preservation Officer . . . with

respect to tribal land."); *see also United Keetoowah Band of Cherokee Indians*, 933 F.3d at 734

(explaining that tribes "adopt the responsibilities of State Historic Preservation Officers on Tribal

lands").  Accordingly, when a programmatic agreement is executed with respect to a historic site

that is not on tribal land, a Tribal Historic Preservation Officer does not assume the "functions of

a State Historic Preservation Officer."  *See* 54 U.S.C. § 302702.  Consequently, a Tribal Historic

Preservation Officer is not a required signatory to a programmatic agreement when that

programmatic agreement does not affect tribal lands.

   The Advisory Council's guidance also clarifies that a tribal signatory is required only

when a programmatic agreement affects tribal lands.  The Advisory Council's guidelines explain

that while agencies have an obligation to consult with tribes who have a historic interest in

land—wherever that land may be located—agencies only require a tribe's consent to specific

mitigation when the programmatic agreement covers an undertaking on tribal land.  *See* AR at

00027–00032 (Advisory Council guidelines distinguishing and detailing agencies'

responsibilities with respect to projects on and off tribal lands); AR at 00030 ("[T]he agency

may, but is not required to, invite an Indian tribe to become a signatory or concurring party when

the undertaking or affected historic properties are not on tribal lands."); AR at 00030–00031

("Refusal by an Indian tribe to become a signatory or concurring party to [a programmatic

agreement] for an undertaking on non-tribal lands, however, does not invalidate it. . . . Other

consulting parties, including Indian tribes, may decline to participate, but they cannot terminate

consultation.").

Whether a tribe's sign-off is required for the execution of a programmatic agreement therefore turns on whether the programmatic agreement affects a historic site on tribal lands. Thus, to assess whether the Tribe's sign-off was required here, the Court must determine whether the I-95 Viaduct Bridge project affected a historic site on tribal lands.  "Tribal lands" is defined by the regulation to mean "all lands within the exterior boundaries of any Indian reservation and all dependent Indian communities."  *Id.* § 800.16(x).  So far as the Court can tell based on the administrative record, the I-95 Viaduct Bridge construction project is located in the city of Providence—adjacent to the Rhode Island State House—and not within the Narragansett reservation.  *See* AR at 000284; 000977; AR at 001196.  Nor does the record support an argument that the bridge is located within a "dependent Indian communit[y]."  Accordingly, the Court concludes that the programmatic agreement does not affect tribal lands and that, therefore, the Tribe was not a required signatory to the programmatic agreement.[5]

---

[5] At one point in the Tribe's reply brief, the Tribe implies in passing that the programmatic agreement affects tribal property because the Mitigation Properties are located within the Tribe's reservation's boundaries.  *See* Pl.'s Reply at 7 ("The Agency knew well the tribe was opposed to these measures, because the properties to serve as mitigation for the Viaduct Project, were significant historic properties to the tribe [and] w[]ere within the Tribe's reservation boundaries.").  But the Tribe does not provide any support in the administrative record for the contention that the programmatic agreement affects tribal lands.  *See id.* Additionally, "[a]rguments raised for the first time in a reply brief are forfeited," *Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023), and "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived," *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 265 (D.D.C. 2018) (quotation omitted).  Moreover, the text of 36 C.F.R. §§ 800.1(a), 800.2(c)(2), 800.4(d), 800.11, & 800.14(b)(2)(iii), (f), all indicate that Section 106 requires that a tribal officer act as a signatory only when the "affected" property is on tribal land, not when properties used for mitigation are located on tribal lands.  *See also* AR at 00027–00030 (Advisory Council guidance stating that "the agency *may, but is not required to*, invite an Indian tribe to become a signatory or concurring party *when the undertaking or affected historic properties* are not on tribal lands" (emphasis added)).  Accordingly, even if the Tribe could show that the Mitigation Properties were located on tribal land, the Tribe cannot show that the affected historic property—at the site of the bridge construction—is on tribal lands and, thus, the regulation does not require a tribal signatory to execute the programmatic agreement.

The Tribe contends that 36 C.F.R. §§ 800.14(b)(3) and 800.6 require a different result. *See* Pl.'s Reply at 2–3, 5–6 (arguing that when a tribe is included in the consultation process, it must have authority to execute, amend, or terminate a programmatic agreement). Specifically, the Tribe argues that § 800.14(b)(3) requires the agency to comply with § 800.6 and that § 800.6 requires a tribal signatory to execute an agreement regardless of where the affected historic property is located. But §§ 800.14(b)(3) and 800.6 do not require what the Tribe contends they require.

To begin with, § 800.14(b)(3) specifies that "[c]onsultation to develop a programmatic agreement for dealing with the potential adverse effects of complex projects or multiple undertakings shall follow § 800.6." 36 C.F.R. § 800.14(b)(3). By its own terms, therefore, § 800.14(b)(3) applies only to "complex projects or multiple undertakings." *Id.* But not all programmatic agreements deal with "complex projects or multiple undertakings"; some programmatic agreements are put in place to implement "a particular program." *Id.* § 800.14(b). Accordingly, not every programmatic agreement must follow § 800.6. And here, the Tribe does not point to anything in the administrative record to indicate that the programmatic agreement deals with a "complex project[] or multiple undertakings." *Id.* Rather, the programmatic agreement appears to deal with a single undertaking—the building of the I-95 Viaduct Bridge. *See generally* AR at 000970–000975.

Furthermore, even if the programmatic agreement at issue here required the agency to follow the procedure detailed in § 800.6, that procedure does not require the Tribe's signature for the execution of a programmatic agreement. The Tribe focuses on the language in § 800.6(c)(1), which specifies that for the execution of a memorandum of agreement "the agency official and the [State Historic Preservation Officer] / [Tribal Historic Preservation Officer]" must be

signatories and that the "signatories have sole authority to execute, amend or terminate the agreement in accordance with this subpart." 36 C.F.R. § 800.6(c)(1). What the Tribe fails to recognize is that § 800.6(c)(1)—by using a virgule (forward slash) to separate "State Historic Preservation Officers" from "Tribal Historic Preservation Officer"—appears to contemplate that *either* a State Historic Preservation Officer *or* a Tribal Historic Preservation Officer must be a signatory; not both. *See Knous v. United States*, 683 F. App'x 859, 864 (11th Cir. 2017) ("Courts have repeatedly recognized that a slash, solidus, or virgule is used to separate alternatives."); *see also Virgule*, Webster's II Collegiate Dictionary 1234 (1995) ("A diagonal mark (/) used esp. to separate alternatives."). While it is possible that both a State Historic Preservation Officer and a Tribal Historic Preservation Officer could act as signatories, that result is not *required* by the text of § 800.6(c)(1).

Moreover, the text of § 800.6(c)(2) clarifies that § 800.6(c)(1) does not require a Tribal Historic Preservation Officer to be a signatory for a memorandum of agreement when the memorandum of agreement does not relate to Tribal Lands. Section 800.6(c)(2) discusses "invited signatories." 36 C.F.R. § 800.6(c)(2). Invited signatories are additional parties that may be invited by the Agency to sign a memorandum of agreement and who, by signing the agreement, obtain "the same rights with regard to seeking amendment or termination of the memorandum of agreement as other signatories." *Id.* § 800.6(c)(2)(i). The regulation explains that an "agency official *may* invite an Indian tribe . . . that attaches religious and cultural significance to historic properties located off tribal lands to be a signatory to a memorandum of agreement concerning such properties." *Id.* § 800.6(c)(2)(ii) (emphasis added). If § 800.6(c)(1) required a tribal signatory regardless of where a historic site was located, as the Tribe contends, § 800.6(c)(2) would be superfluous because tribes would already be required signatories.

Accordingly, § 800.6 is best read to permit, but not require, the Agency in this case to invite the Tribe to be a signatory because the historic properties affected by the bridge construction project are not on tribal lands.  *See also Coyote Valley Band of Pomo Indians of Cal. v. U.S. Dep't of Transportation*, No. 15-cv-04987, 2018 WL 1587212, at *14 (N.D. Cal. Apr. 2, 2018) (noting that "[n]othing in that regulation requires the parties to reach an agreement on a memorandum of agreement" where the historic property is "located off tribal lands").

Similarly, 36 C.F.R. § 800.14(f) does not change the Court's analysis.  Citing § 800.14(f)(2), the Tribe contends that "as a signatory the Tribe's view and agreement are required."  Pl.'s Reply at 1; *see also* Pl.'s MSJ at 32, 37.  But § 800.14(f)(2) requires only that when an agency uses the programmatic agreement process, "the agency official shall ensure that development of the program alternative includes appropriate government-to-government consultation with affected Indian tribes" and that the agency "shall provide summaries of the views, along with copies of any written comments, provided by affected Indian tribes . . . to the [Advisory] Council as part of the documentation for the proposed" programmatic agreement.  36 C.F.R. § 800.14(f)(2).  Additionally, "[t]he agency official and the Council shall take those views into account in reaching a final decision on the proposed program alternative." *Id.*

By its plain terms, § 800.14(f)(2) does not require that the Agency obtain the Tribe's agreement or consent before executing a programmatic agreement.  Rather, under the regulation, the Agency must obtain the Tribe's views and comments about the programmatic agreement and "take those views into account." *Id.*  The fact that the regulation merely requires the Agency to "take those views into account" undermines the Tribe's contention that something more is required.  Additionally, the Tribe's contention that the role of a consulting party is equivalent to that of a required signatory party is undermined by the regulation's definition of "consultation."

*See* 36 C.F.R. § 800.16(f) ("Consultation means the process of seeking, discussing, and considering the views of other participants, and, *where feasible, seeking agreement* with them regarding matters arising in the [S]ection 106 process." (emphasis added)).  The consultation process requires only that an agency seek agreement with consulting parties "where feasible" and does not categorically require the Agency to obtain the Tribe's sign-off before executing a programmatic agreement.  Accordingly, nothing in the NHPA's implementing regulations requires the Tribe's consent for the programmatic agreement's execution.

The Tribe separately argues that the Agency failed to provide a reasoned explanation for the Agency's different treatment of the Tribe in the first and second programmatic agreements, suggesting that the Agency's decision was arbitrary and capricious.  *See* Pl.'s MSJ at 13–14, 37–38 (arguing that agency failed to articulate a rationale for changing its position by excluding "the Tribe as a Stakeholder/signatory and failing to consult with the tribe in the early development of the" second programmatic agreement).  "[I]t is axiomatic that an agency adjudication must either be consistent with prior adjudications or offer a reasoned basis for its departure from precedent," *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1443 (D.C. Cir. 1997) (quotation marks and citation omitted); *see also Duke Energy Carolinas, LLC v. FERC*, 883 F.3d 923, 926 (D.C. Cir. 2018) ("Essentially, the court must look to whether [the Agency] articulated a rational explanation for its action and either acted consistent with or offered a reasoned basis for its departure from precedent." (cleaned up)); *Safari Club Int'l v. Zinke*, 878 F.3d 316, 331 (D.C. Cir. 2017) ("[W]hen an agency changes its position regarding a regulatory matter, it must provide reasoned explanation for its action." (quotation marks and citation omitted)).  But "an agency is permitted to change its policies so long as it provides a reasoned explanation for doing so."  *Hosp. Menonita de Guayama, Inc. v. NLRB*, 94 F.4th 1, 14 (D.C. Cir. 2024).  In other words, the

agency's action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The court cannot supply an explanation that the agency failed to give, but it may uphold an agency's reasoning even where it is "articulated only briefly and in a somewhat conclusory fashion." *Chiquita Brands Int'l Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015).

Here, although the Agency did so in a brief fashion, it did explain why the Tribe was treated as a required signatory for the initial programmatic agreement but only as a concurring or invited signatory for the second programmatic agreement.  As the Tribe acknowledges, the Agency sent the Tribe a letter explaining that

> [t]he project's adverse effects to historic properties are not on Tribal land, thus the Rhode Island State Historic Preservation Office (RISHPO) is the official with jurisdiction over the historic resource.  Also, the mitigation commitments in the [second programmatic agreement] do not require any action or responsibility on the Tribe.  Therefore, [the Agency] is granting the Tribe concurring party status in the [second programmatic agreement] as recommended by 36 CFR 800.6(c)(3).

*See* Pl.'s MSJ at 31 (quoting AR at 000643–000644).

The Agency's first explanation—that the "project's adverse effects to historic properties are not on Tribal land"—does not appear reasoned given that the first programmatic agreement similarly did not affect tribal lands.  That said, the Agency's second explanation—that "the mitigation commitments in the [second programmatic agreement] do not require any action or responsibility on the Tribe"—is a reasoned explanation for the Tribe's different treatment in the second programmatic agreement.  Unlike the first programmatic agreement that placed responsibility for the management of the Mitigation Properties with the Tribe, the second programmatic agreement places responsibility for those properties with the State.  Although the Tribe understandably disagrees with the change in the way the Agency treated it between the two programmatic agreements, the Court will not second guess the Agency's decision where the

Agency has provided a reasoned explanation for the change. *See Long v. United States Dep't of Health & Hum. Servs.*, 422 F. Supp. 3d 143, 150 (D.D.C. 2019) (court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (citation omitted)); *see also Barker v. United States*, 404 F. Supp. 3d 251, 265 (D.D.C. 2019) (refusing to disturb agency decision when decision was "well-reasoned and sufficiently explained").  The Agency's decision to treat the Tribe differently in the second programmatic agreement where that agreement did not require the Tribe to take mitigation measures was reasonable and "understandable." *See Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) (agency's "findings and rationales" must be "understandable" (citation omitted)).   While it made sense to treat the Tribe as a signatory in the first programmatic agreement because, in that agreement, the Tribe was required to take certain mitigation actions, the second programmatic agreement does not require the Tribe to take any mitigation actions, and therefore a lessened role for the Tribe is reasonable and understandable. *See* AR at 00030 (Advisory Council guidance stating that "[i]f a tribe is *assuming review or other responsibilities* under the [programmatic agreement], the agency should *consider* inviting the tribe to become a signatory." (emphasis added)); *see also United Keetoowah Band of Cherokee Indians*, 933 F.3d at 747 (agency decision reasonable and sufficiently explained when agency decision was "consistent with the Advisory Council's preexisting guidance" and "[did] not violate [agency's] duty to consult with tribes").  Thus, the Agency made a reasonable determination based on the information before it.  Because the Agency has provided a reasoned explanation for its change, the Court concludes that the decision was not arbitrary and capricious.

### 2. Consultation Requirement

Beyond its contention that it was required as a signatory to the programmatic agreement, the Tribe also argues that the Agency failed to consult with the Tribe as required under Section 106. *See* Pl.'s MSJ at 14–16, 31, 35. Section 106 requires that agencies give tribes a reasonable opportunity "to identify historic properties, to express concerns regarding those properties, and to participate in the resolution of those concerns" but a tribe's disagreement with an "agency's methodology" does not undermine the reasonableness of the agency's consultation. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 306 (D.C. Cir. 2022)

As explained above, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f). There is a dearth of "precedent concerning what standards the agencies must use to comply with their NHPA consultation obligations." *Eagle Cnty.*, 82 F.4th at 1189. However, where a stakeholder participates in the agency's "process of seeking, discussing, and considering the views of other[s]," and has a chance to "raise[] its concerns," that is sufficient to satisfy the consultation requirement. *Id.*; *see also United Keetoowah Band of Cherokee Indians*, 933 F.3d at 750–51 (describing consultation as the process of "seek[ing] advice or information of" the tribe and finding consultation requirement satisfied where agency "documented extensive meetings it held with [t]ribes before it issued" its decision); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 27–28 (D.D.C. 2016) (holding that agency was likely to show that it satisfied consultation requirement when it sent an early notification to tribes, contacted tribes to discuss agency's plans, and solicited tribes' input).

Here, the Agency clearly sought out, discussed, and considered the Tribe's views.  As early as June 28, 2018, the Agency informed the Tribe that it was initiating a new programmatic agreement.  *See* AR at 000270.  On September 10, 2018, the Tribe responded that the mitigation proposed in the Agency's letter was inadequate.  *See* AR at 000270.  On October 1, 2018, the Agency responded, acknowledged the Tribe's dissatisfaction with the proposed mitigation measures, and sought out the Tribe's further input.  *See* AR at 000267.  The Tribe then sent an additional letter vehemently opposing the mitigation measures being considered by the Agency. *See* AR at 000272–000273 ("To say these proposed mitigation items do not respond to the severity of the adverse effects that the Viaduct Project has already had on, and will have on the culturally and religiously significant Providence Coveland sites is an understatement.").  The Agency also informed the Advisory Council that it intended to begin a new consultation process that included the Tribe.  *See* AR at 000324.  And the Agency expressed that it was "considering all points of view and all information provided" including information provided on behalf of the Tribe.  *See* AR at 000371.  On December 12, 2018, the Tribe reiterated its objections to the Agency's proposed draft programmatic agreement.  *See* AR at 000414.

On December 19, 2018, the Agency sent the Tribe a proposed agreement it had with Rhode Island concerning co-management of a particular historic site and requested the Tribe's comment on that agreement.  *See* AR at 000404.  On February 13, 2019, the Tribe sent a letter to the Agency with a list of questions about the Agency's process for drafting the second programmatic agreement and continuing to object to the mitigation measures in the proposed agreement.  *See* AR at 000483–000484.  On March 5, 2019, the Agency responded to the Tribe's questions.  *See* AR at 000643–000644.

Later, the Agency sent the Tribe the proposed second programmatic agreement and the Tribe again strenuously objected to that Agreement.  *See* AR at 000705, 000711.  The Agency also had discussions with the Tribe, where the Tribe had an opportunity to share its objections and propose changes to the second programmatic agreement.  *See* AR at 000441–000444, 000508, 000839.

Additionally, it appears from the record that a meeting took place between the Tribe and other stakeholders to try to come to some agreement with respect to mitigation measures other than those proposed in the second programmatic agreement.  *See* AR at 000649–000652 (correspondence from Tribe regarding consultation meeting on April 17, 2019).  In that meeting, Rhode Island suggested transferring to the Tribe the Mitigation Properties that the Tribe desired, subject to certain conditions, but the Tribe rejected that proposal.  *Id.*  It appears that the Tribe put forth a counteroffer, that the Agency requested Rhode Island's response to the counteroffer, and that Rhode Island rejected the Tribe's counteroffer.  *See* AR at 000658.  The Tribe again proposed mitigation measures on April 25, 2019, *see* AR at 000835, and the record indicates that the Agency continuously took into consideration the Tribe's proposals, *see* AR at 000834; AR at 000900 ("The [Agency], in consultation with all the Section 106 consulting parties has taken into consideration all the proposals presented for evaluation, including the [Tribe's] April 25, 2019 proposal.").

The Tribe's Historic Preservation Officer also sent the Agency additional emails about the proposed mitigation measures on June 12, 2019 and June 26, 2019.  *See* AR at 000711; AR at 000759.  And following up on the Tribe's emails, the Agency scheduled a meeting with the Tribe for June 26, 2019 and also asked the Tribe if it would like to take part in a one-on-one

consultation with the Agency or otherwise take part in a group consultation with other stakeholders on July 17, 2019.  *See* AR at 000775; AR at 000839.

Throughout the consultation process, the Tribe repeatedly objected that the Agency had not consulted with it, even though the Agency repeatedly solicited comments from the Tribe and the Tribe appears to have put forward its own mitigation proposals, which the Agency indicated it considered.  And, in fact, the provisions of the second programmatic agreement did change over the course of the consultation process.  *See* AR at 000836 (Tribe's lawyer describing change in proposed management structure of one of the Mitigation Properties).  If the Tribe wished for the second programmatic agreement to include different provisions, it had the opportunity to propose those changes at multiple points in the consultation process.  Rather than proposing other alternatives, it appears that the Tribe continuously rejected efforts to find alternative mitigation measures to those that had been rejected by Rhode Island.  *See*, *e.g.*, AR at 000882. The fact that the Tribe is unsatisfied with the Agency's final decision about the mitigation measures in the second programmatic agreement does not mean that the Tribe was not consulted. There is no question that the Agency requested the Tribe's views, that the Tribe expressed its views, and that the Agency considered and responded to those views.  Accordingly, the Agency complied with the consultation requirement set forth in the Act and its regulations.  *See Eagle Cnty.*, 82 F.4th at 1189.

The Tribe also argues that the Agency did not consult with it because the Agency was predisposed to reject the Tribe's preferred mitigation measures.  *See* Pl.'s MSJ at 18, 25, 34.  The fact that the Agency did not believe it would be able to obtain the Tribe's consent to the second programmatic agreement absent the Tribe's preferred mitigation does not change the fact that the Agency sought out and considered the Tribe's proposals and concerns.  The Tribe even

acknowledges that the Agency reached out to the Tribe and sought the Tribe's comments. *See* Pl.'s MSJ at 17–25 (detailing the many communications between the Tribe and Agency); *see also* Def.'s Cross-MSJ at 5–11 (same). Ultimately—galling to the Tribe as it may be, and as explained above—the Agency was not required to obtain the Tribe's consent to the mitigation terms before executing the second programmatic agreement. Given that the Agency consulted with the Tribe as required by the NHPA's implementing regulations, that is sufficient to satisfy the Section 106 process in this case. *See United Keetoowah Band of Cherokee Indians*, 933 F.3d at 750 (rejecting Indian tribes' argument that agency decision had already been made prior to consultation where agency "appeared to seek, discuss, and consider the views of the [t]ribes, even if it did not ultimately adopt those views" (cleaned up)). Because the Agency fulfilled its Section 106 obligations, the Court concludes that the Agency's execution of the second programmatic agreement did not violate the APA.[6]

## V.  CONCLUSION

For the foregoing reasons, the Court **DENIES** the Tribe's motion for summary judgment (ECF No. 42) and **GRANTS** the Agency's motion for summary judgment (ECF No. 43). An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 23, 2024                              RUDOLPH CONTRERAS
                                                  United States District Judge

---

[6] Because the Tribe's claim fails and the Court grants summary judgment to the Agency, the Court need not discuss the Tribe's entitlement to relief, including damages.